Susan Gradman, Chief Trial Attorney, admitted *pro hac vice*
Brigitte Weyls, Trial Attorney, admitted *pro hac vice*
Attorneys for the U.S. Commodity Futures Trading Commission
525 W. Monroe St., Suite 1100
Chicago, IL 60661
Gradman (312) 596-0523
sgradman@cftc.gov
Weyls (312) 596-0547
bweyls@cftc.gov

Local Counsel
Daniel J. Wadley
Local Counsel - Utah Bar # 10358
U.S. Securities and Exchange Commission
15 W. South Temple St., Suite 1800
Salt Lake City, Utah 84101
801-524-3422
wadleyd@sec.gov

FILED
U.S. DISTRICT COURT

2013 MAY 14  A 10: 16

DISTRICT OF UTAH

BY:_____
    DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH
## CENTRAL DIVISION

| | |
|---|---|
| U.S. Commodity Futures Trading Commission, | |
| Plaintiff, | Case No.: 12-cv-415-DB |
| v. | |
| | Honorable Judge Dee Benson |
| Christopher D. Hales, Eric A. Richardson and Bentley Equities, LLC, | |
| | **[ ORDER FOR ENTRY OF FINAL JUDGMENT BY DEFAULT, PERMANENT INJUNCTION, CIVIL MONETARY PENALTIES AND OTHER EQUITABLE RELIEF AGAINST DEFENDANTS CHRISTOPHER D. HALES AND BENTLEY EQUITIES, LLC** |
| Defendants. | |

1

## I.    INTRODUCTION

On December 17, 2012, Plaintiff U.S. Commodity Futures Trading Commission ("Commission" or "CFTC") filed a six count Amended Complaint against Christopher D. Hales ("Hales"), Eric A. Richardson ("Richardson") and Bentley Equities, LLC ("Bentley") seeking injunctive and other equitable relief, as well as the imposition of civil penalties, for violations of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1 *et seq.* (2006 and Supp. III 2009), as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC Reauthorization Act of 2008 ("CRA")), §§ 13101-13204, 122 Stat. 1651 (enacted June 18, 2008) and the Commission Regulations ("Regulations") promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2010).  Defendants Hales and Bentley (collectively, "Defendants") were properly served with the Alias Summons and Amended Complaint on January 3, 2013, but to date, have failed to answer or otherwise defend the Amended Complaint or participate in any aspect of this litigation.  The Clerk of the Court entered a default against Hales and Bentley on March 7, 2013, pursuant to Fed. R. Civ. P. 55(a).  Hales and Bentley have not sought to set aside the Clerk's default.

This Court has reviewed the Commission's Amended Complaint; the Commission's Motion and Memorandum for Entry of Final Judgment By Default, Permanent Injunction and Other Ancillary Relief Against Defendants Hales and Bentley, and an Appendix of Declarations and Exhibits in Support of Plaintiff's Motion.  The Court, being fully advised in the premises, finds that there is good cause for the entry of this Order for Entry of Final Judgment by Default, Permanent Injunction and Other Equitable Relief against Defendants Hales and Bentley (hereinafter "Order") and that there is no just reason for delay.  The Court therefore directs the

entry of the following Findings of Fact, Conclusions of Law, Final Judgment by Default and Permanent Injunction and Equitable Relief pursuant to Section 6c of the Act, as amended, 7 U.S.C. § 13a-1, as set forth herein.

## II.    FINDINGS OF FACT

**THIS COURT HEREBY FINDS:**

### A.    Jurisdiction and Venue

1.    This Court has jurisdiction over this action pursuant to Section 6c of the Act, as amended, 7 U.S.C. § 13a-1, which provides that whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the Commission may bring an action in the proper district court of the United States against such person to enjoin such act or practice, or to enforce compliance with the Act, or any rule, regulation, or order thereunder.

2.    Venue properly lies with this Court pursuant to Section 6c(e) of the Act, as amended, 7 U.S.C. § 13a-1(e), because the Defendants are found in, inhabit, or transact business in this district, and the acts and practices conducted in violation of the Act have occurred, are occurring, or are about to occur within this district, among other places.

### B.    The Parties

3.    Plaintiff **U.S. Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with administering and enforcing the Act, as amended, 7 U.S.C. §§ 1 *et seq.*, and the Commission Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.* (2012).

3

4.      Defendant **Christopher D. Hales** is thirty-two (32) years old and is currently an inmate at the Federal Correctional Institution in Safford, Arizona.  On November 2, 2011, Hales was sentenced to 90 months incarceration and ordered to pay $12,719,236 in criminal restitution in connection with a judgment entered against him for the conduct alleged in this matter as well as mortgage fraud.  *USA v. Christopher D. Hales*, 2:10-cr-00183 (C.D. UT, Mar. 10, 2010) ("*USA v. Hales*") ($6,986,206 of Hales' restitution amount is to be paid jointly and severally with John P. Grealish, as ordered in *USA v. John P. Grealish*, 2:11-cr-00083 (C.D. UT, Jan. 26, 2011)).  From at least April 9, 2009 to the present, Hales has been an owner, manager, organizer and agent of Bentley and owns approximately 50% of Bentley.  Hales has never been registered with the Commission in any capacity.

5.      Defendant **Bentley Equities, LLC** is a Delaware limited liability company formed by Hales and Richardson on or about April 9, 2009 for the purpose of investing commodity customer funds, but is currently in default status for failure to pay its annual franchise tax fee.  Between April 2009 and December 2009, Bentley's principal place of business was Richardson's residence in Cedar Hills, Utah and between January 2010 and August 2010, Bentley's principal place of business was Hales' residence in Draper, Utah.  Bentley has never been registered with the Commission in any capacity.

**C.      Related Entity**

6.      **Freedom Wealth Group LLC** ("FWG"), now known as Tactic Trading LLC, is a Nevada limited liability company with its principal place of business in Carson City, Nevada. FWG also maintains additional offices in Pleasant Grove, Utah and previously, Sandy, Utah. FWG purports to be an educational company, teaching a "niche trading strategy" to its customers

through its automated trading indicators, written educational materials and instructions and presentations designed to help individuals trade their own accounts. FWG has never been registered with the Commission in any capacity and on April 28, 2009 filed a Notice of Exemption with the National Futures Association pursuant to Commission Regulation 4.14(a)(8)(i)(B), 17 C.F.R. § 4.14(a)(8)(i)(B) (2007), seeking exemption from registration with the Commission as a Commodity Trading Advisor ("CTA").

**D.    The Bentley Pool Account**

7.    Between May 2009 and August 2010 (hereinafter "the relevant period"), Hales and Bentley fraudulently solicited investors to trade managed commodity futures and during this same period Hales, Bentley and Hales' partner in Bentley (hereinafter "Individual A") fraudulently accepted approximately $1,209,943 from 33 investors to trade managed commodity futures.

8.    On July 16, 2009, Individual A opened a commodity futures trading account in the name of Bentley (hereinafter "the Bentley pool account") at a futures commission merchant ("FCM") registered with the CFTC and falsely represented to the FCM via email and in the account opening documents that the account would trade only "Bentley Equities own firm capital," not third party customer funds. Individual A was the sole authorized trader on the Bentley pool account from July 16, 2009 to December 29, 2009, when he removed himself from the account paperwork. Thereafter, Hales was the sole authorized trader on the account until August 12, 2010, when the account was closed.

9.    Of the $1,209,943 that Hales, Bentley and Individual A fraudulently accepted from investors during the relevant period, $1,100,943 came from 30 commodity pool participants

5

(hereinafter "pool participants" or "participants") for the purpose of trading commodity futures through the Bentley pool account while the remaining $109,000 came from three clients for the purpose of trading commodity futures in individual managed accounts in the clients' names at the same FCM where the Bentley pool account was maintained.

10.    Although Individual A advised the FCM that the Bentley pool account would trade only "Bentley Equities own firm capital," between July 16, 2009, when the account was opened, and August 12, 2010, when the account was closed, Bentley, Hales and Individual A deposited approximately $591,350 of the $1,209,943 in participant and client funds Hales and Bentley had solicited and Hales, Bentley and Individual A accepted into the Bentley pool account.  Between July 2009 and December 2009, Individual A, as the sole authorized trader on the Bentley pool account, traded the account and also directed Hales and others as to what trades to place in the account.   During this period, the Bentley pool account lost approximately $273,850.  From January 2010 through August 2010, Hales made the trading decisions for the Bentley pool account and lost an additional $208,340 trading futures.  Thus, between July 2009 and August 2010, the Bentley pool account sustained total losses of $482,190.

11.    Between July 2009 and August 2010, Hales received daily and monthly account statements for the Bentley pool account via email from Individual A and/or the FCM reflecting the above losses.  Additionally, between July 2009 and August 2010, Hales had access to the FCM's online trading system and could access the Bentley pool account's trading performance at any time.

**E.    Managed Accounts**

12.    Between February 2010 and May 2010, Hales directed at least three clients to open individual trading accounts at the same FCM where the Bentley pool account was maintained and then provide Bentley and Hales with the funds that they wished to deposit into these accounts.  Hales promised that Bentley would fund and trade these accounts for the clients. On February 3, 2010 and May 26, 2010, the three clients opened up their respective individual trading accounts at the FCM and provided Hales and Bentley with at least $109,000 to trade the accounts as instructed, but Hales and Bentley never funded or traded the accounts as promised. Instead, Hales misappropriated the money for Hales' personal use.

13.    Also, between July 2009 and August 2010, Hales solicited and directed at least 14 clients to open and fund their own individual trading accounts at the same FCM where the Bentley pool account was maintained.  During that period, 14 clients opened and funded individual accounts in their own names with a total of $1,233,875 for Hales and Bentley to manage.  Hales obtained a power of attorney to trade approximately eight of these 14 accounts. Hales instructed the other six clients to provide him with their respective usernames and passwords to trade their accounts and traded their accounts without obtaining a power of attorney as required.  These 14 accounts suffered trading losses totaling approximately $814,430.  Hales traded these 14 accounts online and was able to see the account activity and track the account performance of all 14 accounts.

**F.    Hales and Bentley Knowingly Made Misrepresentations and Omissions to Participants and Clients**

14.    Between July 2009 and August 2010, Hales solicited participants and clients to trade commodity futures in the Bentley pool account or in managed accounts over the telephone,

7

through face-to-face meetings at restaurants and Hales' home, monthly trading seminars hosted

by FWG in the Salt Lake City, Utah area, and presentations at FWG's offices in Utah. During

these solicitations, Hales told prospective participants and clients that he was a highly successful

and experienced commodity futures trader. He also stated that Bentley actively managed more

than $1 million in commodity futures trading accounts, that Bentley made hundreds of thousands

of dollars in profits, had earned either 2% to 5% per day, 15% to 20% per month, or 80% to 90%

per year trading for participants and clients pursuant to trading software and had not had a losing

month in more than two years.

15.     During the monthly trading seminars hosted by FWG, Hales also demonstrated

Bentley's purported successful trading pursuant to his trading software to participants and clients

on various computers, guaranteed profits of at least 10% per month, and made no mention of the

risks of trading commodity futures.

16.     Hales encouraged the managed account clients to open accounts at the same FCM

that carried the Bentley pool account and the trading accounts through which he and Bentley

were operating their scheme. Hales claimed to participants and clients that the FCM carrying the

Bentley pool account had trading systems compatible with the trading software Bentley and

Hales purportedly used to trade the Bentley pool account and individual client accounts.

17.     Hales knew that these misrepresentations were false or recklessly disregarded the

truth while making them. Hales was not a successful commodity futures trader and the Bentley

pool account and individual client managed trading accounts suffered consistent monthly losses

totaling approximately $482,190 for the Bentley pool account and approximately $814,430 for

the individual client managed accounts during the relevant period. Further, Hales was not an experienced trader and did not trade commodity futures prior to July 2009.

18.     In addition, Hales and Bentley did not use trading software as represented in trading for and on behalf of participants and clients. Hales and Bentley provided at least one participant and two clients with a document titled, "Contractual Joint Venture Agreement" and/or "Contractual Joint Venture Agreement and Memorandum of Understanding," which Hales and Individual A signed as officers and agents of Bentley on September 15, 2009, December 29, 2009 and February 5, 2010. The Contractual Joint Venture Agreement states that participants' funds would be invested into "a futures trading account." Hales also advised participants and clients that all profits generated from the trading of the Bentley Pool account and individual client accounts were to be split 50/50 with the participants and clients. Hales and Bentley were to be solely compensated by the 50/50 profit split.

19.     Hales, Bentley and Individual A never generated any profits from their futures trading. Thus, there never was an instance in which Hales, Bentley or Individual A were entitled to be paid. Hales and Bentley did not use all of the funds Defendants received from participants and clients pursuant to the Agreement for the purpose of investing in a futures trading account. Instead, Hales misappropriated at least $382,080 of these funds for his personal use.

**G.     False Reports**

20.     Although Bentley's, Hales' and Individual A's trading for participants and clients suffered consistent losses, Bentley and Hales falsely represented to the participants and clients both verbally and in writing that Hales and Bentley were earning returns from 7% to 10% per month. Between August 2009 and August 2010, Hales and Bentley altered trading statements

9

they received from the FCM carrying the Bentley pool account to falsely reflect profitable trading of futures contracts, and falsely reported trading profits in the Bentley pool account when, in fact, the accounts were suffering consistent monthly losses. Hales and Bentley sent via e-mail or hand delivery the falsified statements to participants and clients via to conceal the actual trading losses and misappropriations.

### H.    Commingling and Misappropriation of Participants' and Clients' Funds

21.    Between April 2009 and July 2009, Hales and Individual A opened two bank accounts in the name of Bentley, one with JP Morgan Bank ("JPM") and the other with Zions Bank ("Zions") (collectively, the "Bentley bank accounts"). Hales and Individual A have at all relevant times maintained exclusive control over the Bentley bank accounts. At the same time, Hales maintained two personal bank accounts, one in his own name at JPM and the other in his name and another third party's name located at Zions ("Hales bank accounts"), and at all times relevant has maintained control over the Hales bank accounts. During the relevant period, Hales and Bentley instructed participants and clients to invest via cash, check or wire transfer made payable to the Bentley bank accounts or the Hales bank accounts and Hales, Bentley and Individual A accepted $1,118,800 deposited by participants and managed account clients into the Bentley bank accounts and Hales accepted $91,143 deposited by participants into the Hales bank accounts, for a total of $1,209,943, where they were commingled with the funds of Hales, Individual A and others.

22.    Bentley, Hales and Individual A transferred only $591,350 of the participant and client funds they accepted for deposit into the Bentley bank accounts and Hales bank accounts into the Bentley pool account, and of that amount lost $482,190 trading futures.

23.     As for the remaining $727,753 that Hales and Bentley solicited and Hales, and Bentley and Individual A accepted, but did not lose trading futures, Bentley, Hales and Individual A misappropriated those funds for their own personal use. Between July 2009 and August 2010, Hales misappropriated at least $382,080 in cash from the Bentley bank accounts that Hales used for food, clothing, auto expenses, utility payments, travel expenses and personal credit card payments. Bentley, Hales and Individual A never disclosed to participants and clients that they would use their funds for these purposes.

24.     Between August 20, 2009 and December 31, 2009, Hales obtained funds from the Bentley bank account at JPM by requesting them from Individual A. Individual A provided Hales with approximately $7,500 from the Bentley JPM bank account during this time.

## I.     Failure to Register

25.     During the relevant period, Bentley acted as a commodity pool operator ("CPO") in that it solicited and accepted funds from at least 30 participants for the purpose of pooling the funds in the Bentley pool account and investing the funds in commodity futures. Bentley was not registered with the CFTC as a CPO as required under Section 4m(1) of the Act, 7 U.S.C. § 6m (2006). Hales was a partner, officer, employee and/or agent of Bentley and solicited funds from prospective and existing participants for participation in the Bentley pool account. Therefore, Hales was required to be registered with the CFTC as an associated person ("AP") of Bentley pursuant to Section 4k(2) of the Act, 7 U.S.C. § 6k(2)(2006). However, Hales was never registered as such or exempt from such registration. Additionally, Bentley, while acting as a CPO, allowed Hales to act as its AP when it knew or should have known that Hales was not registered as an AP.

11

26.     During the relevant period, Hales also held himself out generally to the public as a CTA in that he solicited clients to open individual managed accounts that he would trade in exchange for 50% of any profits earned in the accounts, and touted his trading expertise at FWG seminars and face-to-face meetings at his home. Therefore, Hales was required to be registered as a CTA, but was not registered as such or exempt from such registration as required under Section 4m(1) of the Act.

**J.     Hales is a Controlling Person of Bentley**

27.     Hales was a principal, manager and agent of Bentley and during the relevant period held himself out to the public as such. Hales managed the day to day operations of Bentley and solicited participants to trade commodity futures in the Bentley pool that he and Individual A managed. Hales also solicited clients to trade commodity futures through individual managed trading accounts. Hales was responsible for conducting the futures trading on behalf of Bentley's participants and the individual client accounts at the FCM. Hales also signed agreements with Bentley's participants as a manager, officer and agent of Bentley.

28.     Hales was an authorized signatory on the Bentley bank accounts and the Hales bank accounts, all four of which received participants' and clients' funds for the purpose of trading commodity futures. Hales was also one of two authorized traders on the Bentley pool account at the FCM. Moreover, Hales had actual knowledge about the trading losses and misappropriation of participants' and clients' funds and continued to solicit new participants and clients with profitability claims. Accordingly, Hales had actual knowledge of the core activities that constitute the violations at issue here and allowed them to continue.

### III.    CONCLUSIONS OF LAW

**THIS COURT HEREBY FINDS:**

**A.    Hales and Bentley Violated Section 4b(a)(1)(A), (C) of the Act**

29.    Section 4b(a)(1)(A) and (C) of the Act, as amended, 7 U.S.C. § 6b(a)(1)(A), (C) (2006 and Supp. III 2009), makes it unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in  interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person: (A) to cheat or defraud or attempt to cheat or defraud such other person; or (C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for such other person.

30.    During the relevant period, Hales and Bentley violated Section 4b(a)(1)(A) and (C) of the Act, by, among other things, knowingly, or with reckless disregard for the truth:

        (a)    Soliciting prospective and actual participants and clients to invest in commodity futures through fraudulent misrepresentations and omissions about Defendants' past and current trading performance and claiming that their trading of participants' and clients' funds was profitable;

        (b)    Failing to disclose to participants and clients that their funds were used for purposes other than trading, and in particular that their funds were used for their personal expenses; and

        (c)    Misappropriating participants' and clients' funds.

**B.**    **Hales and Bentley Violated Section 4b(a)(1)(B) of the Act**

31.    Section 4b(a)(1)(B) of the Act, as amended, 7 U.S.C. § 6b(a)(1)(B) (2006 and Supp. III 2009), makes it unlawful for any person, in or in connection with any contract of sale of any commodity for future delivery or other agreement, contract or transaction "willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record."

32.    During the relevant period, Hales and Bentley violated Section 4b(a)(1)(B) of the Act, by, among other things,  knowingly, or with reckless disregard for the truth , preparing and delivering to participants and clients account statements falsely representing that their trading of participants' and client's funds had been profitable when in fact, they were suffering consistent monthly losses.

**C.**    **Hales and Bentley Violated Section 4o(1)(A), (B) of the Act**

33.    Section 4o(1)(A) of the Act, 7 U.S.C. § 6o(1)(A) (2006), makes it unlawful for a CPO or a CTA or their AP to employ any device, scheme, or artifice to defraud any prospective or actual participant or client by use of the mails, and Section 4o(1)(B) of the Act, 7 U.S.C. § 6o(1)(B) (2006), makes it unlawful for a CPO or a CTA or their APs to engage in any transaction, practice, or course of business that operates as a fraud or deceit upon any prospective or actual participant or client by use of the mails.

34.    During the relevant period, Bentley acted as a CPO in that it engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, and in connection therewith solicited, accepted, or received funds, securities, or property from others for the purpose of trading in commodities for future delivery on or subject to the rules of any

14

contract market and Hales acted as an AP of Bentley, a CPO, in that, as an officer, manager and

agent of Bentley, he knowingly, or with reckless disregard for the truth, solicited and accepted

funds, securities, or property for Bentley.  Additionally, Hales also held himself out generally to

the public as a CTA in that he solicited clients to open individual managed accounts that he

would trade in exchange for 50% of any profits earned in the accounts, and touted his trading

expertise at FWG seminars and face-to-face meetings at his home.

35.     During the relevant period, Hales, individually, and as officer, manager and agent

of Bentley, and Bentley violated Section 4o(1)(A), (B) of the Act, by defrauding and deceiving

participants and clients, by among other things:

> (a)     Making oral misrepresentations and omissions of fact to prospective and
> actual participants and clients that Defendants were experienced and
> successful commodity futures traders, and that their trading of
> participants' funds was profitable;

> (b)     Failing to disclose to participants and clients that their funds were used for
> purposes other than trading, and in particular that their funds were used for
> their personal expenses; and

> (c)     Issuing false statements to participants and clients to conceal Defendants'
> misappropriation.

36.     The above misrepresentations and omissions of fact that Hales, individually and

on behalf of Bentley, and Bentley made to prospective and actual participants and clients were

made through use of the mails or other means or instrumentalities of interstate commerce, and

they were made by Bentley, a CPO and Hales as the AP of the CPO and as a CTA in violation of

Section 4o(1)(A), (B) of the Act.

**D.**   **Bentley Violated Commission Regulation 4.20(c)**

37.     Commission Regulation 4.20(c), 17 C.F.R. § 4.20(c) (2010), provides that no CPO may commingle the property of any pool that it operates or that it intends to operate with the property of any other person.  During the relevant period, Bentley violated Regulation 4.20(c) by commingling participant funds intended for investment in the Bentley pool account with Hales' funds and the funds of others.

**E.**   **Bentley and Hales Violated Section 4m(1) of the Act**

38.     Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006), provides that it is unlawful for any CPO, unless registered under the Act, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as a CPO.  Section 4m(1) of the Act also makes it unlawful for a CTA, unless registered as such under the Act, to make use of the mails or instrumentalities of interstate commerce in connection with his business as a CTA, unless he is exempt from registration because he has not provided commodity trading advice to more than fifteen (15) persons during the preceding twelve month period and has not held himself out generally to the public as a CTA.

39.     During the relevant period, Bentley acted as a CPO because it solicited funds from multiple customers and pooled those funds together in one account to place trades in the commodity futures markets.  Bentley did not claim exemption from registration, nor did it qualify for the exemptions identified in Regulation 4.13, 17 C.F.R. § 4.13 (2010).  Therefore, Bentley violated Section 4m(1) of the Act.

40.     During the relevant period, Hales held himself out to the public as a CTA, by soliciting clients to open individual managed accounts that he would trade in exchange for 50%

16

of any profits earned in the accounts, and touting his trading expertise at FWG seminars and face-to-face meetings at his home, and in doing so, used e-mail and the telephone to communicate with his clients and prospective clients. Moreover, Hales used instrumentalities of interstate commerce in connection with his CTA business. Hales acted as a CTA and was required to be registered as a CTA and he failed to do so. His failure constitutes a violation of Section 4m(1) of the Act.

**F.   Hales and Bentley Violated Section 4k(2) of the Act**

41.     Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2006), makes it unlawful for any person to be associated with a CPO as a partner, officer, employee, consultant, or agent or any person occupying a similar status or performing similar functions, in any capacity that involves: (i) the solicitation of funds, securities, or property for a participation in a commodity pool; or (ii) the supervision of any person or persons so engaged, unless such person is registered under the Act as an AP of the CPO. During the relevant period, Hales acted as an AP of a CPO, Bentley, by soliciting funds for the Bentley pool account without the benefit of registration with the Commission. Therefore, Hales' failure to register as an AP of a CPO violates Section 4k(2) of the Act.

42.     Furthermore, Bentley permitted Hales to act as its AP, even though it knew or should have known that he was not registered as its AP. Bentley therefore also violated Section 4k(2) of the Act.

**G.   Hales' Liability As A Controlling Person of Bentley**

43.     During the relevant period, Hales was a controlling person of Bentley and failed to act in good faith or knowingly induced, directly or indirectly, the acts constituting the

violations.  Therefore, Hales is liable for the unlawful conduct of Bentley and its violations of the Act, pursuant to Section 13(b) of the Act, as amended, to be codified at 7 U.S.C. § 13c(b) (2006).

**H.    Defendant Bentley is Vicariously Liable for the Acts of Defendant Hales**

44.    Hales committed the acts and omissions described above within the course and scope of his being the owner, manager and agent of Bentley; therefore, Bentley is liable under Section 2(a)(1)(B) of the Act, as amended by the CRA, to be codified at 7 U.S.C. §2(a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.2 (2010), for violations of the Act committed by Hales.

**I.    Injunctive Relief is Appropriate**

45.    Under Section 6c of the Act, 7 U.S.C. § 13a-1, injunctive relief is appropriate where there is a reasonable likelihood of future violations.  Unless restrained and enjoined by this Court, Defendants Hales and Bentley are likely to continue to engage in the acts and practices alleged in the Commission's Amended Complaint, or in similar acts and practices.

**THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that Defendants Hales and Bentley have violated Sections 4b(a)(1)(A)-(C), 4*o*(1)(A) and (B), 4m(1) and 4k(2) of the Act, as amended, 7 U.S.C. §§ 6b(a)(1)(A)-(C) (2006 and Supp. III 2009), 7 U.S.C. §§ 6*o*(1)(A), (B), 6m(1) and 6k(2) (2006); and Defendant Bentley has violated Commission Regulation 4.20, 17 C.F.R. § 4.20 (2012).  Therefore, judgment shall be and hereby is entered in favor of plaintiff U.S. Commodity Futures Trading Commission and against Defendants Hales and Bentley as follows:

## IV.   PERMANENT INJUNCTIVE RELIEF GRANTED

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

46.     Based upon and in connection with the foregoing conduct, pursuant to Section 6c of the Act, as amended, 7 U.S.C. § 13a-1, Hales and Bentley are permanently restrained, enjoined and prohibited from directly or indirectly engaging in conduct in violation of Sections 4b(a)(1)(A)-(C), 4o(1)(A) and (B), 4m(1) and 4k(2) of the Act, as amended, 7 U.S.C. §§ 6b(a)(1)(A)-(C) (2006 and Supp. III 2009), 7 U.S.C. §§ 6o(1)(A), (B), 6m(1) and 6k(2) (2006); and Bentley is also permanently restrained, enjoined and prohibited from directly or indirectly engaging in conduct in violation of Commission Regulation 4.20, 17 C.F.R. § 4.20 (2012).

47.     Defendants Hales and Bentley are also permanently restrained, enjoined and prohibited from:

> A.     Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, 7 U.S.C. § 1a);
>
> B.     Entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 1.3 (hh), 17 C.F.R. § 1.3(hh) (2012)) ("commodity options"), security futures products, swaps (as that term is defined in Section 1a(47) of the Act, as amended, and as further defined by Commission Regulation 1.3(xxx), 17 C.F.R. § 1.3(xxx)) ("swaps"), and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, as amended, 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)) ("forex contracts") for their own personal accounts or for any account in which Hales and/or Bentley have a direct or indirect interest;
>
> C.     Having any commodity futures, options on commodity futures, commodity options, security futures products, swaps, and/or forex contracts traded on their behalf;
>
> D.     Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving

commodity futures, options on commodity futures, commodity options, security futures products, swaps and/or forex contracts;

E.      Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, security futures products, swaps and/or forex contracts;

F.      Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2012); and/or

G.      Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2012)), agent or any other officer or employee of any person (as that term is defined in Section 1a of the Act, as amended, 7 U.S.C. § 1a) registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2012).

## V.      CIVIL MONETARY PENALTY AND DISGORGEMENT

### A.     Civil Monetary Penalty

48.      Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), permits this Court to assess a civil monetary penalty of not more than the higher of (a) $140,000 for each violation occurring after October 18, 2010, or (b) triple the monetary gain to Hales and Bentley for each violation of the Act and Regulations.  17 C.F.R. § 143.8 (2012).

49.      Hales shall pay a civil monetary penalty of $1,146,240 (one million, one-hundred and forty-six thousand, two-hundred and forty dollars), within ten (10) days of the date of entry of this Order (the "CMP Obligation").  Post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2006).

50.     Bentley shall pay a civil monetary penalty of $840,000 (eight-hundred, forty thousand dollars), within ten (10) days of the date of entry of this Order (the "CMP Obligation"). Post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2006).

**B.   Disgorgement**

51.     Hales shall pay disgorgement in the amount of $ 382,080 (three-hundred, eighty thousand dollars), within ten (10) days of the date of entry of this Order ("Disgorgement Obligation"). Post-judgment interest shall accrue on the Disgorgement Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

**A.   Payments and Partial Payments**

52.     Defendants Hales and Bentley shall pay their respective CMP Obligation, and Defendant Hales shall pay his Disgorgement Obligation, by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, the payment shall be made payable to the U.S. Commodity Futures Trading Commission and sent to the address below:

U.S. Commodity Futures Trading Commission
Division of Enforcement
ATTN: Accounts Receivable – AMZ 340
E-mail Box: 9-AMZ-AR-CFTC
DOT/FAA/MMAC
6500 S. MacArthur Blvd
Oklahoma, OK 73169
Telephone: (405) 954-5644

53.     If payment by electronic transfer is chosen, Defendants Hales and Bentley shall

contact Linda Zurhorst at the address above or her successor for instructions and shall fully

comply with those instructions.  Defendants Hales and Bentley shall accompany payment of the

penalty with a cover letter that identifies the paying Defendant and the name and case number of

this proceeding.  Hales and Bentley shall simultaneously transmit copies of the cover letter and

the form of payment to the Chief Financial Officer, U.S. Commodity Futures Trading

Commission, Three Lafayette Square, 1155 21st Street, NW, Washington, DC 20581 and to the

Regional Counsel/Associate Director, Commodity Futures Trading Commission, Central

Regional Office, 525 West Monroe, Suite 1100, Chicago, IL 60661.

54.     Any acceptance by the Commission of partial payment of the Disgorgement

Obligation and/or CMP Obligation shall not be deemed a waiver of Hales' and Bentley's

respective requirements to make further payments pursuant to this Order, or a waiver of the

Commission's right to compel payment of any remaining balance.

## VI.     MISCELLANEOUS PROVISIONS

**IT IS FURTHER ORDERED THAT:**

55.     <u>Notices</u>: All notices required to be given by any provision in this Order shall be

sent certified mail, return receipt requested and shall reference the name and docket number of

this action, as follows:

a.  **Notice to Commission:**

Associate Director
Division of Enforcement - Central Region
Commodity Futures Trading Commission
525 West Monroe Street, Suite 1100
Chicago, Illinois 60661

b.  **Notice to Hales and Bentley**
Christopher D. Hales, Register No. XXXXX-081
FCI SAFFORD
Federal Correctional Institution
1529 West Highway 366
Safford, AZ 85546

56.     Change of Address/Phone:  Until such time as Defendants Hales and Bentley

satisfy their respective CMP Obligation and Hales satisfies his Disgorgement Obligation, as set

forth in this Order, in the event that either Hales or Bentley change their respective address(es) or

telephone number(s), Hales and Bentley shall provide written notice of the new number(s) and/or

address(es) to the Commission within twenty (20) calendar days thereof.

57.     Modification of Order: Nothing shall serve to amend or modify this Order in any

respect whatsoever, unless:  (a) reduced to writing; and (b) approved by order of this Court.

58.     Invalidation:    If any provision of this Order or if the application of any

provisions or circumstances is held invalid, the remainder of the Order and the application of the

provisions to any other person or circumstance shall not be affected by the holding.

59.     Continuing Jurisdiction of this Court:  This Court shall retain jurisdiction of this

case to assure compliance with this Order and for all other purposes related to this action,

including resolution of the Commission's action against Defendant Richardson or any motion by

a Party to modify or for relief from the terms of this Order.

60.     Injunctive and Equitable Relief Provisions: The injunctive and equitable relief provisions of this Order shall be binding upon Hales and Bentley, upon any person under their authority or control, and upon any person who receives actual notice of this Order, by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with Hales and/or Bentley.

61.     Copies: Copies of this Order may be served by any means, including U.S. Mail, facsimile transmission, e-mail, United Parcel Service and Federal Express, upon Hales and Bentley, and any other entity or person that may be subject to any provision of this Order.

There being no just reason for delay, the Clerk of the Court is hereby directed to enter this Order for Entry of Final Judgment By Default and Permanent Injunction, Restitution, Disgorgement, Civil Monetary Penalty and Other Equitable Relief.

**IT IS SO ORDERED.**

Dated: 13th Day of May, 2013

_____
Honorable Judge Dee Benson
UNITED STATES DISTRICT JUDGE